# Richmond

CHARLES J. ALLEN v. ROUSEVILLE COOPERAGE COMPANY.

November 12, 1931.

Present, Campbell, Holt, Epes, Hudgins and Gregory, JJ.

The opinion states the case.

*Rudolph Bumgardner,* for the plaintiff in error.

*Herbert J. Taylor, Carroll E. Sutter* and *Walton & Walton,* for the defendant in error.

EPES, J., delivered the opinion of the court.

On July 24, 1924, Rouseville Cooperage Company, a foreign corporation, filed its petition for attachment in the Corporation Court of the city of Staunton, against George Hallauer and Charles J. Allen, who are residents of the State

of New York. The purpose of the attachment proceeding is to recover a past due debt which the petitioner claims to be due to it from the defendants.

The ground of attachment is that Hallauer and Allen are both nonresidents of Virginia, and that each owns an undivided one-third interest in a lot of land in Staunton, Virginia, upon which there is an apple evaporating plant, and in the machinery and personal property in that plant.

The allegation of the petition with reference to the indebtedness of the defendants to the petitioner reads:

"George Hallauer and Charles J. Allen, formerly doing business as Hallauer and Allen, are justly indebted to it in the sum of $2,300.00 with interest thereon from September 29, 1923, * * * evidenced by the promissory negotiable note of the said Hallauer and Allen, in the said sum of $2,-300.00 dated September 19, 1923, and payable forty-five *days* after its date at the Oil City National Bank, with interest from date, a copy of which said note, marked Exhibit A, is filed herewith and prayed to be received and read as a part of this petition."

Exhibit A is in the words and figures following:

"<i>For Renewal</i>

"$2,300.00        Rochester, N. Y., September 29, 1923.

"Forty-Five.........after date we promise to pay to the order of Rouseville Cooperage Co.

"Two Thousand Three Hundred............0/00 Dollars

"Payable at Oil City National Bank

"Value received with interest

"No. 17.25          Due          HALLAUER & ALLEN.

"Per Geo. Hallauer."

(<i>Notation on Back</i>)

"HALLAUER & ALLEN

"November, 14        2,300.00

"Rouseville Cooperage Co.

"L. M. MANN, Prest."

The pleadings and the evidence are silent as to by whom

and under what circumstances the words "for renewal" and the notations on the back of this note were made.

An attachment issued and was levied on July 25, 1924, upon "the one-third undivided interest of George Hallauer and also on the one-third undivided interest of Charles J. Allen" in the property in the city of Staunton mentioned in the petition.

A copy of the attachment was served upon Hallauer on November 11, 1924, in the county of Rappahannock; but Hallauer has not filed any pleading or made any defense in this cause, and is not here appealing. He was, however, introduced as a witness by Rouseville Cooperage Company and testified in this cause.

There was no process served upon Allen; but by leave of court, Allen, in December, 1925, filed his answer to the petition. In his answer he denies that he and Hallauer had been in partnership at any time since July, 1920; that Hallauer had authority to obligate him (Allen) for the payment of this note or the debt for which it was given; and that he was in any way liable on this note or the debt for which it was given. It is to be noted that it is not contended that the debt here sued upon is the obligation of or has any connection with any partnership existing between Hallauer and Allen prior to July 20, 1920.

All the transactions involved in this proceeding took place in the State of New York, and the contract sued upon was made and to be executed there. All the evidence was in the form of depositions taken in New York.

The court heard the case without the intervention of a jury and entered judgment in favor of Rouseville Cooperage Company against George Hallauer and Charles J. Allen for $2,300.00 with interest thereon from September 29, 1923, and costs. It also adjudged that the property levied on belonged to a partnership composed of Allen and Wooster, that Hallauer had no interest therein, but that the judg-

ment rendered against Hallauer and Allen was a lien on Allen's interest therein.

From this judgment of the court Allen has appealed, and has been granted a writ of error. In his petition he, in effect, makes only two assignments of error.

The first assignment of error is that the court erred in not dismissing this proceeding as to Allen, because the evidence is insufficient to support a finding that Hallauer and Allen were partners, or that Hallauer was in any other way authorized to obligate Allen for the payment of this note or the debt for which it was given.

The note sued upon was executed and delivered by Hallauer to the Rouseville Cooperage Company. Allen had no knowledge of the fact that such a note had been executed by Hallauer until payment thereof was demanded of him. The consideration for which the note was given was the purchase price of a quantity of barrels purchased from the Rouseville Cooperage Company in 1922, through Dillaphaine H. Wright, a broker, under a written contract made by Hallauer in the name of Hallauer and Allen, which Hallauer signed "Hallauer & Allen." These barrels, or certainly most of them, were used as containers in which to ship vinegar produced from apple waste at a vinegar plant in Victor, New York, which was operated by George Hallauer and Charles J. Allen during the five months period June to October, 1922.

About these facts the parties are agreed. The controversy is with reference to the nature and terms of the agreement between Allen and Hallauer under which they were manufacturing vinegar at this plant; and whether, under the agreement actually existing between them Hallauer had authority, express or implied, to obligate Allen, jointly with himself, for the purchase of the barrels from Rouseville Cooperage Company, and for the payment of the note here sued upon.

The facts leading up to the making of the agreement under which Hallauer and Allen were operating this plant are as follows:

Allen and Wooster, as partners, were operating several apple evaporating plants, and Allen, Wooster and Keymel were operating another. Hallauer was also operating several apple evaporating plants, some of which he operated individually, and others of which he operated in partnership with persons other than Allen or Wooster. Hallauer individually and the partnerships in which he was interested had accumulated a quantity of apple waste (cores and skins) in their operations, as had also the partnerships in which Allen was interested.

In the spring of 1922, Hallauer conceived the idea of disposing of the waste owned by him and his partners by converting it into vinegar, and for this purpose arranged to get the use of a large vinegar plant in Victor, New York, which was not being operated by its owner. He was to pay nothing for the use of the plant, but it was necessary to repair the plant and "soak up the generators" before it could be operated. This preliminary expense was larger than Hallauer felt would be warranted by the quantity of vinegar which could be made from the waste owned by him and the partnerships in which he was interested.

Hallauer proposed to Allen that Allen "go in" with him in the use of this plant, convert therein into vinegar the waste owned by the Allen partnerships, and bear a part of the expense of repairing the plant and "soaking up the generators."

Allen did not think well of the proposition, but made some inquiries as to the expediency of going into the venture. Among others he talked with Dillaphaine H. Wright, the broker above mentioned, with whom he discussed the salability of vinegar made from apple waste, the price that could be gotten therefor, and the cost of cooperage.

From time to time, during a period of some three or four months, in the spring of 1922, Hallauer had conversations with Allen with reference to this project; but Allen did not agree in any of these conversations to go into the proposed venture. The evidence does not show what was said in these conversations, or anything more in detail as to the original proposal made to Allen by Hallauer than is above given.

Finally, in the early summer of 1922, after Hallauer had delivered some of the waste owned by him and his partners ·to the plant at Victor, New York, and begun operations, he again urged Allen to go in with him and convert the waste of the Allen interests into vinegar in this plant, bearing a part of the expense. At. this time, as an inducement to Allen to go into the venture, Hallauer told Allen, as Allen. himself testifies:

"I have sold 2,000 barrels of vinegar to the National Vinegar Company, which will take care of the operating expenses. * * * We will take care of the expense out of that." He also told Allen the price at which he had sold this vinegar.

The contract for the sale of this 2,000 barrels of vinegar was made by Hallauer, through Dillaphaine H. Wright, the broker. Though it was made before Allen consented to go into this venture, the contract purported to be a contract made by Hallauer and Allen for the sale of 2,000 barrels of vinegar to the National Vinegar Company, and Hallauer signed it "Hallauer & Allen." No satisfactory explanation is made of this fact by Hallauer in his testimony, and Allen denies that he knew until after this controversy arose that the contract had been so made.

Following this conversation Allen agreed to go into the venture, and with the consent of his partner, Wooster, delivered the waste owned by the Allen and Wooster partnerships at the Victor plant for conversion into vinegar.

There was no written agreement between Allen and Hallauer; and there seems to have been at no time any concrete oral expression made of the whole agreement which actually existed between them. In many particulars the terms of their agreement can be determined only from inferences from the negotiations between them and their subsequent acts and conduct.

It seems clear, however, that there was no expressed stipulation between them that they should be partners. Hallauer does testify that they "went into equal partnerships," and that they were "partners in the results;" but his other testimony makes it apparent that these statements are merely his conclusions, and that he is not stating that they expressly stipulated that they were to be partners.

In his testimony Allen gives this version of the agreement between Hallauer and himself:

The waste owned by the Allen interests did not have the same vinegar producing value as the waste owned by the Hallauer interests; and when he agreed to deliver the waste owned by the Allen partnerships for conversion into vinegar in this plant, his understanding was that the waste delivered by him and that delivered by Hallauer should be worked up separately; that each should receive the vinegar actually produced by his waste, and each pay the actual cost of working up his waste and also a part of the expense of repairing the plant and "soaking up the generators." This was, however, found to be impractical in actual operations. It was then agreed between Hallauer and himself that the waste delivered by them should be worked up indiscriminately; but that the vinegar produced should be divided between them *in kind* in proportion to the number of pounds of waste delivered by each, and the total cost of repairs and operations paid by them in this same proportion; and that each of them should dispose of his part of the vinegar and collect therefor. However, in order to take care of the

difference in the quality of his waste and that of Hallauer, the waste delivered by each was to be tested for sugar content and grainage, and the actual number of pounds delivered expressed in equivalent pounds of a waste of standard sugar content and grainage, which equivalents were to be used as the basis of the division of the vinegar produced and of the expense.

Both Allen and Hallauer agree that they were to share in proportion to the pounds of waste delivered by each; but Hallauer's testimony is that they were to share in the net profits in this proportion.

While Allen does not so state in terms, the inference from his testimony is that it was further understood that Hallauer should look after the manufacturing operations and finance the expenses of the operations, and that Allen should reimburse Hallauer for his proportion thereof, or that, as Allen in his petition alleges, "they were to be billed for their proportion of costs."

The testimony of both Allen and Hallauer shows that Allen did in fact leave Hallauer to look after practically all the operations of the plant, the conduct of the business of the operations, and the financing of the operations; and there is no evidence tending to show that Allen advanced the money for or paid any part of the costs of the operations. So far as they were paid, they were paid by Hallauer either from his own funds or from the proceeds of vinegar sold.

There was some trouble about the National Vinegar Company accepting the vinegar sold to it, and the price finally accepted for some, at least, of it was less than the original contract price. The venture did not succeed as well as they had anticipated; and in addition to this Allen claims that Hallauer appropriated the money received from the sale of the 3,000 barrels sold to the National Vinegar Company without making any accounting to him and without paying a number of obligations he (Hallauer) had in-

curred. Hallauer claims that he paid out for the joint operation about as much as he received from the sale of vinegar.

Allen in his testimony expressly denies that he ever agreed that the operations should be conducted under the name of Hallauer and Allen, or authorized or knowingly permitted Hallauer to use that name, or knew that Hallauer had made any contracts which purported to be made by Hallauer and Allen; that he ever authorized or permitted Hallauer to sell any part of the vinegar produced to which he (Allen) was entitled on a prorata division in kind of the total quantity produced from their combined waste; and that he authorized or permitted Hallauer to purchase barrels in which to put any vinegar to which he (Allen) was entitled or had an interest.

Hallauer testifies that Allen did agree that the operations should be conducted in the name of "Hallauer & Allen," and knew that he (Hallauer) had made written contracts with the National Vinegar Company in the name of "Hallauer & Allen" for the sale of practically the whole amount of vinegar which they expected to produce, and with Rouseville Cooperage Company for the purchase of these barrels, and had so signed these contracts.

However this may be, the unescapable inference from Allen's own testimony is that he did authorize, consent to, or ratify the sale by Hallauer of practically the whole quantity of vinegar produced by them at this plant; that there was never any division in kind of the vinegar made or asked for by Allen; and that Allen knew that Hallauer was purchasing and using barrels for the shipment of the vinegar which had been sold, which vinegar was the common property of Hallauer and himself.

The inducement which Allen says was held out to him by Hallauer to go in with him was that he had sold 2,000 barrels of vinegar to the National Vinegar Company from

the proceeds of which "we will take care of the expense." The testimony given by Wright, the broker, through whom this vinegar had been sold by Hallauer, the testimony of Hallauer, and the testimony of Allen all show that, when some trouble developed with reference to the acceptance by the National Vinegar Company of a part of this 2,000 barrels, Allen not only had interviews with Wright in an effort to get the National Vinegar Company to take the vinegar, but that he and Hallauer together made one or more trips to Buffalo, New York, to see the National Vinegar Company about it.

In addition to this 2,000 barrels, Hallauer later made a sale, through Wright, to the National Vinegar Company of 1,000 barrels. This 1,000 barrels was sold under a written contract signed "Hallauer and Allen." Hallauer says that the making of the contract was discussed with Allen before it was made, and that Allen saw the contract after it was signed; and Wright's testimony tends to support Hallauer's statement about this. Allen denies this; but he admits that some time after this sale was made, Hallauer told him that he (Hallauer) had sold this 1,000 barrels. However, the inference is strong from Allen's own testimony that he knew of the sale of this 1,000 barrels certainly before deliveries were made thereon; and the testimony of Wright and the testimony of Hallauer, if true, both show that Allen participated in attending to matters directly connected with making deliveries of this 1,000 barrels.

It may here be noted that the uncontradicted testimony is that Allen and Hallauer both estimated that their combined waste would produce about 3,000 barrels of vinegar; and Allen in his petition states it as a fact that Hallauer sold 3,000 barrels of the vinegar produced and "only left a small quantity of the vinegar unsold."

Wright, the broker through whom the barrels were purchased, testifies that Allen talked to him about the purchase

of barrels; and Hallauer's testimony with reference to this and related subjects is in part as follows:

"Q. Did you have any conversations * * * with Mr. Allen in regard to the purchase of barrels?

"A. We talked it over, first, regarding the purchase of barrels and found that we could buy as cheaply through Mr. Wright as anywhere else. I imagine that the time that we made the purchase we didn't know from which factory it was coming and the price it was offered to us was the best we had on hand through Mr. Wright and we agreed to purchase a certain quantity to cover the basis of probable sales we had at that time.

"Q. In your conversations with Mr. Allen what was said in regard to the negotiation of the contracts as to the name in which you should do business, or otherwise?

"A. We agreed to do business under the name of Hallauer and Allen.

"Q. And Mr. Allen gave his consent to do that?

"A. He did.

"Q. And he knew that these contracts were executed in the name of Hallauer and Allen?

"A. He did.

"Q. Did you ever show Mr. Allen the contracts?

"A. Yes; he saw them.

"Q. Both of them?

"A. Are you referring to the barrels?

"Q. The contracts for the barrels and for the sale of vinegar?

"A. Yes; he saw them.

"Q. Who had general charge of the conduct of the business at Victor?

"A. The details fell on me.

"Q. What was your agreement with Mr. Allen in regard to the conduct of the business; the manufacturing and looking to the managerial end of it; or the every-day hard work?

"A. Why; I would like to answer it in this way; then I will come to a conclusion; that Mr. Allen didn't have very good office equipment and I had the office equipment and naturally the correspondence fell to me; then the final—probably signing a good deal of these contracts—I didn't sign the National Vinegar contract without first showing it to him and going over it thoroughly. That might not be true of the barrels, but I think we talked it over; I think I signed the contract for the barrels after discussing it with him; he only saw the contract after it was signed."

The argument of counsel on both sides is largely devoted to a discussion of whether a partnership existed in fact between Allen and Hallauer; and the trial court seems to have based its judgment upon a finding that a partnership did in fact exist between them. But it is not necessary here to decide this point. The real question here involved is, was Hallauer either expressly or impliedly authorized to obligate Allen, jointly with himself, for the purchase price of these barrels from the Rouseville Cooperage Company, and for the payment of the note here sued upon, which was given in evidence of the indebtedness to it for the purchase price thereof?

Mutual agency of the partners is one of the incidents of a partnership, but its existence in a joint enterprise is not alone determinative of the actual existence of a partnership; nor is a partnership the only relationship which men may enter into for the prosecution of a joint undertaking which will impliedly authorize one of them to obligate the other, jointly with himself, within the scope of the enterprise.

In the instant case, whether the evidence be sufficient or not to carry the burden of establishing that a partnership, with all its incidents, in fact existed between Allen and Hallauer, the preponderance of the evidence shows, we think, an agreement between them by virtue of which as exemplified by, or as modified by, the subsequent acts of

the parties, Hallauer had, at least, the implied authority to obligate Allen, jointly with himself, for the purchase of these barrels and the payment of the note here sued upon.

The second assignment of error is an afterthought presented for the first time on a petition to rehear filed several months after judgment had been entered. The point made is that, as the note sued upon is incomplete on its face (being made payable "forty-five_____after date"), the court erred in not holding that it cannot be made the basis for an attachment proceeding in Virginia (which it is alleged is a proceeding *in rem*) until, by an appropriate proceeding *in personam* brought in New York, it has been reformed and completed so as to make it conform to the actual agreement and understanding of the parties.

It is further contended by the plaintiff in error that, even if the court has the power in attachment proceedings to reform and complete an incomplete note therein sued upon, it cannot do so in this instance, because there is no evidence in the record to show whether the intention of the parties was that this note should be payable forty-five days, weeks, months, or years after date.

It is true that there is no direct evidence on this point; but the circumstantial evidence warrants the inference and is, in the absence of any allegation or evidence to the contrary, sufficient to establish it as a fact, that the note was intended to be made payable forty-five *days* after date.

A petition for an attachment for the recovery of a past due claim is not under the Virginia statutes purely a proceeding *in rem*. It is a petition for both a judgment *in personam* against the defendant for the amount alleged to be due by him, and a judgment *in rem* against his property.

There can be no judgment *in rem* until the petitioner has established the cause of action in the petition set forth, though of course the adjudication upon the cause of action

cannot be made a personal judgment unless the court has jurisdiction of the parties as well as of the *rem*. But the clear intendment of the attachment statutes is that, when the court in an attachment proceeding has acquired jurisdiction over the person of the defendant, it shall have jurisdiction to proceed, and proceed to final judgment *in personam* against him upon the cause of action set forth in the petition, whenever the attachment of the *rem* is sustained; and also, where the attachment of the *rem* is not sustained, if the cause of action set forth in the petition be such that had the plaintiff brought an appropriate action at law thereon instead of proceeding by a petition for an attachment, the court would have jurisdiction to hear and determine such action. Sections 6380, 6383, 6403, 6404, Code Va. 1919; *Sun Company* v. *Burruss,* 139 Va. 279, 283, 123 S. E. 347; *Maryland Cas. Co.* v. *Parrish,* 150 Va. 473, 478, 143 S. E. 750.

■ Both under the law merchant and the negotiable instrument law (section 5576, Code Va. 1919) the holder of a note in which blanks have been left unfilled has the authority to complete the instrument by filling in the blanks so as to make it conform to the true intention of the parties, if it be done in a reasonable time; and he has the power to do this even after action has been brought thereon. *Chestnut* v. *Chestnut,* 104 Va. 539, 52 S. E. 348, 2 L. R. A. (N. S.) 879, 7 Ann. Cas. 802; *Brown* v. *Thomas,* 120 Va. 763, 92 S. E. 977.

The case at bar presents no question of variance between the note declared upon and the note offered in evidence, as was the case in *Chestnut* v. *Chestnut,* 104 Va. 539, 52 S. E. 348, 2 L. R. A. (N. S.) 879, 7 Ann. Cas. 802; because an exact copy of the note introduced in evidence was attached to and made a part of the petition for attachment.

■ Where the plaintiff in an action at law sets forth in his pleading an exact copy of a negotiable note which reads

"forty-five————————— after date, we promise to pay," and also alleges therein that the note is payable "forty-five *days*" after date, he *in effect* exercises his authority to fill in the blank. The issues presented and the defenses applicable are the same as if he had exercised his authority to fill in the blank in accordance with the intention of the parties, and then brought his action on the completed instrument; and the issues raised are as readily handled in an action in the one case as in the other. There is no good reason why a plaintiff should not be permitted to adopt either course.

As has been said, in the case at bar the circumstantial evidence warrants the inference that the note was intended to be payable forty-five *days* after date; and there is no denial in the pleadings that this was the intention of the parties, or evidence even tending to show that this was not the intention of the parties. The note was executed and delivered on or about September 29, 1923. The petition for attachment in and by which the plaintiff, in effect, exercised his authority to fill in the blank in this note was filed in July, 1924. The lapse of time from September 29, 1923, to July, 1924, is not *ipso facto* an unreasonable lapse of time before the blanks were, in effect, filled in, nor do any other facts or circumstances appear from the record from which it may be said that the authority was not exercised, in effect, within a reasonable time.

For the reasons stated, we are of opinion that the assignments of error made by the plaintiff in error are not well made, and that the judgment of the court should be affirmed.

*Affirmed.*